## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN GREAT LAKES PORTS
ASSOCIATION
   700 12th Street, NW, Suite 700
   Washington, DC 20005,

BROCHART KB
   Trappvagen 5
   Sollentuna, 191 35 Sweden,

CANFORNAV INC.
   800 Rene-Levesque Blvd West
   Suite 2300
   Montreal, Quebec H3B 1X9 Canada,

FEDNAV INTERNATIONAL LTD.
   1000 de La Gauchetière Street West
   Suite 3500
   Montreal, Quebec  H3B 4W5 Canada,

POLSKA ZEGLUGA MORSKA P.P.
   Plac Rodła 8
   70-419 Szczecin, Poland,

SHIPPING FEDERATION OF CANADA
   300 St. Sacrement Street, Suite 326
   Montreal, Quebec H2Y 1X4 Canada,

UNITED STATES GREAT LAKES
SHIPPING ASSOCIATION
   7714 Woodstar Lane
   Concord Township, OH 44077-8993,

and

WAGENBORG SHIPPING BV
   Marktstraat 10
   9934 CK Delfzijl, The Netherlands,

     Plaintiffs,

     v.

ADMIRAL KARL SCHULTZ, in his official

Civil Action No. **********

Capacity as Commandant, United States
Coast Guard
    2703 Martin Luther King Avenue SE
    Washington, DC 20593-7000,

    and

UNITED STATES COAST GUARD
    2703 Martin Luther King Avenue SE
    Washington, DC 20593-7000,

      Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Great Lakes Ports Association, Brochart KB, Canfornav Inc.,
Fednav International Ltd., Polska Zegluga Morska P.P., Shipping Federation of Canada, United
States Great Lakes Shipping Association, and Wagenborg Shipping BV (collectively,
"Plaintiffs"), by counsel, bring this Complaint seeking review of actions by the United States
Coast Guard ("Coast Guard or "the Agency") establishing Great Lakes pilotage rates for the
2018 navigation season.

## NATURE OF THE ACTION

1.       Plaintiffs seek review under the Administrative Procedure Act ("APA"), 5
U.S.C. §§ 551-706, of a final rule promulgated by the Coast Guard, setting pilotage rates on the
Great Lakes effective June 10, 2019.  *Great Lakes Pilotage Rates – 2019 Annual Review and
Revisions to Methodology*, 84 Fed. Reg. 20,551 (May 10, 2019) (the "Final Rule").

2.       The Coast Guard regulates certain aspects of marine pilotage, including pilotage
rates paid by vessel owners and operators in the Great Lakes. *See* Great Lakes Pilotage Act of
1960, 46 U.S.C. §§ 9301-9308 (the "Act").  From 2006 to 2018 pilotage rates have increased
substantially.  Much of this increase has occurred in the last five annual navigation seasons.

3.      The Final Rule establishes significantly increased pilotage rates on vessels using U.S. pilots while transiting the Great Lakes in the remainder of the 2019 navigation season.

4.      These rates became effective on June 10, 2019 and will remain in effect until superseded by new rates established pursuant to subsequent Coast Guard rulemaking proceedings.

5.      The Coast Guard set rates in the Final Rule based on defects in its cost and revenue calculations and supported its decisions with faulty or unexplained logic. The Coast Guard's actions are arbitrary and capricious and an abuse of discretion in violation of the APA.

6.      For the reasons set forth herein, Plaintiffs ask that the Court declare unlawful and vacate the Coast Guard's Final Rule, mandate that the Coast Guard revise its calculations of 2019 pilotage rates to establish lawful 2019 Great Lakes pilotage rates for the duration of the effective period of the 2019 rates, and remand the rulemaking to the Coast Guard for further development and revision consistent with the Court's rulings herein.

## PARTIES

7.      Plaintiff American Great Lakes Ports Association ("AGLPA") is a Washington, D.C., not-for-profit association whose mission is, among other things, to represent the interests of commercial ports and port users on the United States side of the Great Lakes.  AGLPA member ports are served by ocean-going vessel operators subject to Great Lakes pilotage regulations.  Great Lakes ports are dependent on cost-effective waterborne commerce and,

therefore, have a direct interest in a safe, efficient, reliable, and rationally priced pilotage system.

8.      Plaintiff Brochart KB is a Swedish-based bulk and general cargo shipping company operating between Great Lakes and overseas ports. Brochart KB operates in the Great Lakes region and pays for pilotage services subject to the Final Rule.

9.      Plaintiff Canfornav Inc. is an international ocean carrier with a fleet of over 40 vessels.  Canfornav, Inc. serves the St. Lawrence River and Great Lakes, and is one of the largest ocean-going carriers serving that region.  Canfornav Inc. pays for pilotage services subject to the Final Rule.

10.      Plaintiff Fednav International Ltd. ("Fednav") is Canada's largest ocean-going dry-bulk shipowning and chartering group.  Fednav operates vessels in the Great Lakes region and pays for pilotage services subject to the Final Rule.

11.      Plaintiff Polska Zegluga Morska P.P. ("Polsteam") is a Polish state enterprise that manages a fleet of vessels.  Polsteam operates vessels in the Great Lakes region and pays for pilotage services subject to the Final Rule.

12.      Plaintiff Shipping Federation of Canada ("SFC") is a not-for-profit Canadian association created by an act of Canada's parliament in 1903.  SFC's mission is, among other things, to promote and protect the interests of the owners, operators, and agents of vessels involved in international trade, including trade on the St. Lawrence Seaway and Great Lakes. SFC has over 70 member companies from the United States, Canada, and other maritime nations representing over 250 ocean shipping companies.  Members of SFC, including the vessel owners and operators herein that are Plaintiffs, pay for pilotage services subject to the Final Rule.

13.     Plaintiff United States Great Lakes Shipping Association ("USGLSA") is a not-for-profit association whose mission is, among other things, to protect the interests of its vessel agent members located at major ports throughout the Great Lakes.  USGLSA agents serve the international flag vessel fleet entering the Great Lakes and calling at Great Lakes ports. Members of USGLSA are the commercial maritime entities that directly arrange for Great Lakes pilotage services. Consequently, safe, reliable, and rationally priced pilotage is of vital concern to USGLSA and its members.

14.     Plaintiff Wagenborg Shipping BV is an international shipping company. Wagenborg Shipping BV vessels operate in the Great Lakes region and pay for pilotage services subject to the Final Rule.[1]

15.     Defendant Coast Guard is an agency of the United States within the Department of Homeland Security.  The Coast Guard is, and was at all times and for the subject matters relevant hereto, an administrative agency of the United States Government subject to the APA with regard to its rulemaking actions.  *See* 5 U.S.C. § 551.  The Coast Guard is headquartered at 2703 Martin Luther King Avenue SE, Washington, DC 20593.

## JURISDICTION AND VENUE

16.     This action arises under the APA.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1361, and 1651.  This Court is authorized to

---

[1] Plaintiffs Brochart, Canfornav, Fednav, Polsteam, and Wagenborg are collectively referred to in this Complaint as "shipowners" or "ratepayers."

issue the non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the APA, 5 U.S.C. §§ 702, 705, 706.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States.  Defendant United States Coast Guard is found in this District, Defendant Karl Schultz performs his official duties in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.  Regulatory Background

18.     The Act requires foreign (*i.e.*, either non-U.S. flag or non-Canadian flag) vessels on the Great Lakes to use U.S. or Canadian pilots while transiting the waters of the St. Lawrence Seaway and the Great Lakes system.  *See* 46 U.S.C. § 9302(a)(1).  The Coast Guard is required by the Act to annually review the rates paid to those pilots and to adjust the rates based on that review.  *See* 46 U.S.C. § 9303(f).

19.     The Coast Guard is directed by the Act to "prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services."  *Id*.  Congress also charged the Coast Guard with responsibility to prescribe regulations governing the "operation and administration" of approved pilotage pools, to "prescribe a uniform system of accounts," to "perform audits and inspections," and to "require coordination on a reciprocal basis" with Canadian pilotage organizations.  46 U.S.C § 9304.

**B.  The 2019 Notice of Proposed Rulemaking and Final Rule**

20.     On October 17, 2018 the Coast Guard issued a Notice of Proposed Rule

Making.  *See Great Lakes Pilotage Rates - 2019 Annual Review and Revisions to*

*Methodology*, 83 Fed. Reg. 52,355 (the "NPRM").

21.     In the NPRM, the Coast Guard proposed pilotage rates for the 2019 navigation

season.

22.     Plaintiffs, either individually or through organizations of which they are

members, submitted comments to the Coast Guard in response to the NPRM.  Plaintiffs'

comments highlighted, among other things, the issues raised in this Complaint.

23.     The Coast Guard promulgated its Final Rule on May 10, 2019, and the Rule

became effective on June 10, 2019.  *See* 84 Fed. Reg. at 20,551.

24.     The Coast Guard's Final Rule failed to address the comments submitted by

Plaintiffs in a reasoned or meaningful way or, to the extent comments were addressed, the

treatment of the comments was cursory, dismissive, and without substance.

25.     The Final Rule will result in substantial over-collection of revenues, as

measured against stated target revenues, by the Great Lakes pilot associations.

26.     The Coast Guard's regulations governing pilotage rates contain no explicit

provision for refunding or crediting to ratepayers payments of fees that exceed targeted

revenue or compensation levels for pilots.

**1.  The Coast Guard's Use of a 270-Working Day Assumption to Calculate
a Target Benchmark Compensation Figure**

27.     The Coast Guard's annual rate-setting procedures governing pilotage fees on the

Great Lakes establish hourly rates paid by ship-owners to three government-authorized pilot

associations, each of which has been granted by the Coast Guard exclusive monopoly rights to provide mandatory U.S. pilotage in three geographically distinct pilotage districts.

28.     The methodology used by the Coast Guard to set annual pilotage rates establishes a revenue target considered adequate by the Coast Guard to compensate pilots and to fund each pilot association in the coming year.  This revenue target figure is then divided by projected work volume estimates to derive hourly pilotage rates for designated and undesignated waters in each of the three pilotage districts.

29.     Industry comments to the agency's docket in the NPRM challenged the Coast Guard's use of a multiplier value of 270 days to translate daily compensation data of U.S. Great Lakes marine maritime officers into a target per pilot average annual compensation figure.  *See Comments of Shipping Federation of Canada, the American Great Lakes Ports Association and the United States Great Lakes Shipping Association,* USCG-2018-0665-0010 at pp. 4-5 ("Industry Comments").  Industry comments cited Coast Guard regulations in place since the 2016 annual ratemaking exercise that require pilots to observe 10 days per month rest periods, thus limiting the number of working days in a nine-month navigation season to approximately 200 days (a figure that would allow for seasonal variations that sometimes extend the navigability of the Seaway to ten months).  *Id.*  Industry commenters noted that this difference is significant – in 2018, a 200-working day assumption yielded a target average compensation figure (accepting for purposes of the exercise the Coast Guard's inflation adjustments) of $232,164, as opposed to the Coast Guard's proposed value of $319,617. *Id.*  In commenting on a similar methodological error in the 2018 proposed rule, industry commenters also observed that, because the benchmark compensation was being set according to data for compensation of officers on U.S.-flag lake vessels, consistency required that pilots be

compensated only for days worked, as is the case with union members U.S. maritime officers on Great Lakes vessels. *See* id., Exhibit 1. They urged this correction to the NPRM's methodology to achieve a more accurate and comparable use of AMOU data applied to pilot compensation. *Id.* This issue is presently before the Court in *American Great Lakes Ports Association, et al., v. United States Coast Guard, et al.*, Civ. A. 1:18-cv-2650.

30.     In addition, industry commenters had previously noted in the 2018 rate review that a 200-day multiplier was necessary given that Coast Guard staffing decisions authorizing the number of pilots for each of the three pilotage districts were based on a needs assessment that assumed a 200-day work season. Industry Comments, USCG-2018-0665-0010 at 4-5. Because the ratepayer Plaintiffs were expected to fund (through the hourly rate mechanism) the costs of additional pilots added in order to permit observance of the 10-day per month rest requirement, they should not be subjected to the additional costs based on an assumption that the rest period was not being observed. *Id.; see also American Great Lakes Ports Association, et al., v. United States Coast Guard, et al.*, Civ. A. 1:18-cv-2650.

31.     The 2019 Final Rule rejected the Industry Comments to the NPRM docket concerning the use of a 200-day, as opposed to a 270-day, assumption for working days in a navigation season. 84 Fed. Reg. at 20,557-58. When the same issue arose in the prior year's rulemaking, the Coast Guard described Industry commenters' position about the appropriateness of a 200-day multiplier as one that "has merit" but justified the use of a 270-day period by referring to vague, undocumented pilot association claims concerning retention and averments about pilot compensation in other ports. 83 Fed. Reg. at 26,170. Similarly, in this year's rulemaking, the Coast Guard again stated that the Industry position "has merit" but decided that, "…in the interest of recruiting and retaining a suitable number of experienced

pilots, a multiplier of 270 is the preferable course of action." 84 Fed. Reg. at 20,558. The

Coast Guard also again justified the use of the 270-day period for calculating benchmark pilot

compensation by referring generally, without data, to the "…effect on safety and reliability…"

which, it claimed, "…warrant[s] a multiplier of 270." *Id.*

> **2.** **The Coast Guard's Application in the Final Rule of "Guaranteed Overtime" Data from AMOU Sources That Were Submitted in The Notice and Comment Period**

32. As in the previous year's Final Rule, the Coast Guard again made further

upward adjustments to the benchmark compensation figure in the 2019 Final Rule. As

background, in the 2018 Final Rule, the Coast Guard relied on comments from seagoing union

and pilot association commenters to increase the Final Rule benchmark compensation to

include what union commenters described as "standard overtime compensation that is

consistently earned by U.S. merchant mariners under AMO contracts." 83 Fed. Reg. at

265,169. This comment stated that "standard overtime" was the equivalent of an additional 40

hours per month of compensation to AMO personnel on U.S.-flag Great Lakes vessels. Pilot

and union commenters referred to overtime pay earned by U.S. Great Lakes members as

"guaranteed overtime" and urged that the benchmark compensation figure in the proposed rule

be increased by $60.07/hour *x* 40, or $21,625 over the course of a nine-month shipping season.

*Id.*

33. The 2018 Final Rule had stated that the "information on guaranteed overtime is

new to the Coast Guard," but concluded that it "cannot now ignore highly relevant information

simply because it was not apparent at the beginning of the rulemaking process." *Id.* The 2018

Final Rule reflected no effort by the Coast Guard to validate the amount of the so-called

"guaranteed overtime" or to determine the comparability between the circumstances under

which it is paid to crews of U.S.-flag Great Lakes vessels and the functions, hours, and

working conditions of Great Lakes pilots.  Indeed, as noted in the 2019 Industry Comments, it

appears that the Coast Guard simply accepted the AMOU overtime figure at face-value.

Industry Comments, USCG-2018-0665-0010 at p. 5.  The summary acceptance of this

"guaranteed overtime" had resulted, along with inflation increases, in a substantial increase

from the 2018 Proposed Rule's $319,617 average annual compensation per pilot figure to

$352,485, an increase of more than 10 percent in the targeted compensation number. *Id*.

34.     Here, the Coast Guard again made no effort to validate the amount of the so-

called "guaranteed overtime" and again accepted the AMOU overtime figure at face-value.

The Coast Guard stated it adopted the overtime figure "…because the commenter who

provided the overtime figures had firsthand knowledge of the contract between the AMO and

the shippers."  84 Fed. Reg. at 20,558.  The Coast Guard stated that it would be "open to

receiving" information which would cause the Coast Guard to "question the validity of the

overtime figure," but, "as no additional information has been supplied, [the Coast Guard] will

continue to use the best information we have to calculate the target compensation, which at this

time includes the overtime figure."  *Id*.

### 3. The Coast Guard's Use of Ten Years of Traffic Volume Data to Estimate Traffic Volume, But Shorter Periods to Determine Projected Expenses and Manning Levels

35.     In addition to advocating for a 200-day compensation multiplier, Industry

commenters also challenged the Agency's use of a ten-year moving average to calculate traffic

levels in the coming rate year. *See* Industry Comments, USCG-2018-0665-0010, Exhibit 2, p.

4.  Industry commenters asserted that the Coast Guard's use of long term averages leads to a

very slow reaction time to changing traffic levels in the context of the inevitable ups and

downs of each economic cycle. *Id*. Rather than just "looking back," Industry commenters

proposed that the Coast Guard attempt to predict traffic levels by using other factors, such as

economic indicators, market intelligence from stakeholders, recent traffic trends, or any other

source of information (most of the foreign ship traffic is driven by steel and grain), even if

doing so might be done on a trial basis. *Id*.

36.     In the Final Rule, the Coast Guard stated it is "open to suggestions as to how to

better predict total traffic…."  84 Fed. Reg. at 20,559.  However, despite its stated "openness to

suggestions," the Coast Guard did not directly address any of Industry's aforementioned

proposals.  Instead, the Coast Guard claimed that Industry "has mischaracterized the Coast

Guard's data collection and aggregation efforts…." *Id*. at 20,558.  The Coast Guard

acknowledged that "in recent years high levels of traffic have been greater than the historical

average" while also noting that "not unexpectedly, in some years, the level of traffic has been

lower than average." *Id*. at 20,559.  The Coast Guard also acknowledged that "[t]he use of the

10-year average may cause the average to lag trends" but justified it because, the Coast Guard

claimed, the 10-year average "reduce[s] fluctuations in predicted traffic levels resulting in a

more stable rate on a year to year basis." *Id*.

37.     In addition, Industry commenters also contested the Coast Guard's inconsistent

use of time periods for data sets – e.g., the aforementioned ten-year rolling average of

historical traffic volume data against three-year or one-year data for determining expense

levels or pilot staffing needs. Industry Comments, USCG-2018-0665-0010 at p. 2.  The Final

Rule attempted to justify this inconsistency by noting that operating expenses and number of

authorized pilots "…are measured numbers, and thus do not require a predictive mechanism."

84 Fed. Reg. at 20,559.

**4.  The Coast Guard's Failure to Adjust Rates to Reflect Overpayment of
Pilotage Fees Attributable to Methodological Errors in Prior Calendar
Years, Resulting Adverse Effects on Ratepayers, and Pattern of
Significant Over-Collection of Targeted Revenues**

38.     Industry commenters stated that the Coast Guard ratemaking processes had

resulted in substantial over-collections of pilotage revenues and over-compensation of pilots in

the 2015, 2016, 2017, and 2018 Final Rules.  Industry Comments, 2018-0665-0010 at pp. 1-6.

Commenters also stated that Coast Guard rate-setting methodologies had resulted in significant

disparities in the cost of Canadian pilotage versus U.S. pilotage for the same or nearly similar

vessel transits.  *Id*. at p. 3; Exhibit 3 at pp. 7-8.  As an example, commenters cited an April

2017 transit from Sault Ste. Marie, Ontario to Detour, Michigan. Exhibit 3, p. 8.  Double

pilotage practices were followed due to poor conditions, meaning that both an American pilot

and a Canadian pilot were aboard the vessel. *Id*.  The invoice revealed that the **American pilot**

**charge was $21,054** while the **Canadian pilot charge was $6,431** for the **same voyage**. *Id*.  In

this instance, U.S. pilotage costs were 3.3 times that of Canadian pilotage costs. *Id*.

39.     In addition, as demonstrated below, the Coast Guard pilotage rates since 2015

have resulted in significant over-collection of targeted revenues:

|  | Targeted Revenue Collection[2] | Actual Revenue Collection | Percent Over Target Revenue |
|---|---|---|---|
| **2015** | $15,583,653 | $18,996,313 | 21.9% |
| **2016** | $17,453,678 | $28,222,522 | 61.7% |
| **2017** | $22,326,381 | $26,429,565 | 18.4% |
| **2018** | $25,156,442 | $31,409,535 | 24.9% |

---

[2] The targeted revenue collection figures for the 2015 and 2016 navigation seasons are
referenced in the Coast Guard's final rule for 2016, 81 Fed. Reg. 11,908, 11,934, 11,938 (Table
32) (Mar. 7, 2016). The targeted revenue collection figure for the 2017 navigation season is
referenced in the 2018 Final Rule, 83 Fed. Reg. at 26,187 (Table 39). The targeted revenues for
the 2018 and 2019 season are referenced in the final rule for 2019, 84 Fed. Reg. at 20,575
(Table 36).

The 2019 Final Rule established a target revenue of $27,988,185 for the 2019 navigation season, *see* 84 Fed. Reg. at 20,575, and, despite over-collection under the 2018 rate, increased almost every district's pilotage rates:

| Area | Name | Final 2018 Pilotage Rate | Final 2019 Pilotage Rate | Difference |
|---|---|---|---|---|
| District One: Designated | St. Lawrence River | $653 | $733 | + $80 (12.3%) |
| District One: Undesignated | Lake Ontario | $435 | $493 | + $58 (13.3%) |
| District Two: Undesignated | Lake Erie | $497 | $531 | + $34 (6.8%) |
| District Two: Designated | Navigable waters from Southeaster Shoal to Port Huron, MI | $593 | $603 | + $10 (1.7%) |
| District Three: Undesignated | Lake Huron, Michigan, and Superior | $271 | $306 | + $35 (12.9%) |
| District Three: Designated | St. Mary's River | $600 | $594 | - $6 (1%) |

84 Fed. Reg. at 20,572 (Table 32).

Even though pilotage rates for 2019 *increased* under the Final Rule, the targeted revenue figure in the 2019 Final Rule is *less than* the actual revenue collection by the pilotage districts under the lower 2018 rates. The record does not cite to any evidence indicating any factor that would cause a reduction in revenue from the prior year if 2019 rates remained constant.

40.     At the time of the publication of the Final Rule governing 2019 rates, the Coast Guard had access to and knew the actual revenue figures for 2018.

41.     Industry comments to the NPRM docket stated that the proposed 2019 rates would continue the pattern of significant over-collection of targeted revenues. As an example,

Industry comments noted that, in 2017, the prescribed pilotage rates yielded close to $26.5 million in revenue against a targeted figure of $21.7 million.  Industry Comments, USCG-2018-0665-0010 at p. 5.  Industry comments requested that the Coast Guard, at a minimum, validate the real world likelihood of additional over-realization by using known information on pilotage billings to date for 2018 to assess whether rate increase of the proposed magnitude are, in fact, necessary to achieve revenue targets stated in the NPRM. *Id.* at p. 6.

42.     The Final Rule acknowledged that "the Coast Guard agrees with the [Industry Comments] that, in several years, realized revenues have exceeded target revenues…." 84 Fed. Reg. at 20,560.  However, the Coast Guard stated it "does not believe this is a systemic or perpetual position." *Id*.  As previously discussed, the Coast Guard stated that the rates are derived using an average of the most recent 10 years of traffic as a predictor of traffic volume. *Id*.  Thus, the Coast Guard stated, "if the traffic in the current year exceeds the average (*i.e.*, it is a busier than an average year), pilots will realize more than the target revenue, and if it is a slower than an average year, pilots will realize less than the target revenue." *Id*.  The Coast Guard further stated "[b]ecause the last several years that the [Industry Comments] cite have seen larger-than-average traffic flows, additional revenue has been realized." *Id.*

43.     Further, the Coast Guard dismissed Industry's concerns regarding a significant discrepancy in U.S. and Canadian pilotage rates by stating "[s]imple anecdotal comparisons on a single voyage do not provide the Coast Guard with the comprehensive information needed to determine if there is a system-wide problem with rates…." *Id*.

44.     The Coast Guard also attempted to justify the discrepancy in targeted revenues and actual revenues by stating that, "meeting the 'target revenue' is not a goal for the Coast Guard in and of itself; the target revenue is just a marker used by the ratemaking methodology

to set rates assuming an average traffic year." *Id*.  Thus, the Coast Guard claimed, "[t]he revenue realized is expected to vary from 'target revenue' consistent with the manner actual traffic varies from the projected traffic." *Id*.

45.     Industry comments noted that the proposed rule "offered no remedy for recovering overpayments that have resulted in windfall pilotage revenues." Industry Comments, USCG-2018-0665-0010 at p. 6.  Industry comments contended that chronic over-collection of revenues was attributable to several causes, among them that the "Coast Guard methodology contains no routine mechanism for ascertaining the real world effects of rate decisions on actual compensation of pilots." *Id*.  Industry comments proposed that the Coast Guard "require Pilot Association financials to provide individual pilot compensation data, screened to protect individual pilot identities, as part of the standard annual financial reports." *Id*.  Industry comments explained that "[d]ata on actual revenues and pilot compensation generated by given hourly rates would prevent each year's rate-setting exercise from being a theoretical calculation based on theoretical notions of pilot compensation…Industry Commenters believe compensation data for the last four completed navigation seasons will show significant over-compensation of pilots…." *Id*.  Industry comments further stated that "[a]ccurate compensation information is also critical in evaluating frequent, but vague and non-empirical justifications based on recruitment, retention, and attrition of pilots proffered by the Coast Guard." *Id*.

46.     The Final Rule acknowledged that "this information could be used to more accurately compare the compensation of Great Lakes pilots to known salaries of pilots in other pilot associations…."  84 Fed. Reg at 20,560.  However, the Coast Guard stated it "would need

more specific suggestions on how this information would be incorporated into the ratemaking

methodology before considering requiring it." *Id.*

### 5. The Coast Guard's Use of "Working Capital Fund" to Expand Revenue Requirements and Compensation Levels

47.     Industry commenters identified the NPRM's "Working Capital Fund" (Step 5)

as a component of the Coast Guard's methodology that appeared to serve no purpose other than

to add additional costs that generated revenue requirements to be covered by the ultimate

hourly rate levels.  Industry Comments, USCG-2018-0665-0010 at pp. 7-8.  In prior years, this

segment of the Coast Guard's methodology had been referred to as "Return on Investment," a

term that had no commonly understood relationship to the structure of pilotage associations on

the Great Lakes.

48.     The Final Rule addressed this comment by noting that the Coast Guard

transmitted a letter to the pilot associations, dated November 30, 2018, to establish the uses and

restrictions on the working capital fund. 84 Fed. Reg at 20,559.  In summarizing the letter, the

Coast Guard stated that the Working Capital funds "are to be used for capital expenditures

only, and are subject to a reasonableness standard." *Id.* at 20,559-60.  The Coast Guard stated it

"believe[s] that this letter will help to ensure that working capital fund revenues are used for

their intended purposes of facilitating infrastructure improvements." *Id.* at 20,560.

49.     The November 30, 2018 letter referred to by the Coast Guard appears by its

timing and content to be an attempt to correct defects in both the 2018 Final Rule and to

address Industry comments on the 2019 NPRM.  The letter does not amend the NPRM or the

Final Rule, does not address Industry objections to the necessity of a "working capital" fund,

does not correct Industry objections to the bases used by the Coast Guard to calculate this

value, and does not amend the regulations governing recognition of "working capital" as an element of the rate calculation.

>    6.    **The Coast Guard Erred in its Decision to Add $466,940 in Property Acquisition Costs to the Allowable Operating Expenses for Pilotage District 1**

50.    In response to a comment and an unspecified "contemporaneous communication" with the St. Lawrence Seaway Pilots Association, the Coast Guard included $466,940 in property acquisition costs in the Final Rule in the allowable operating expenses of Pilotage District 1. *Id*. at 20,556.  The Coast Guard stated that it recognized these costs "to cover cash outlays made in 2016" to acquire three properties in New York used by the St. Lawrence Seaway Pilots Association (District 1) for "operational needs." *Id*.  The Final Rule states that the Coast Guard "originally believed that these outlays would be covered by money brought in from Step 5 of the ratemaking process, [but] now believe[s], based on the comment and contemporaneous communication with the association, that this should be considered an operating expense." *Id*.

51.    By permitting this capital cost to be deemed recognized operating expenses, the Coast Guard increased the administrative expense component required to be covered by 2019 hourly rates by approximately 47% in District 1 and raised the overall expense target from the NPRM to the Final Rule to cover the $466,940 used to acquire the unspecified three properties. Significantly, as this element was first published in the Final Rule, not the NPRM, ratepayers had no opportunity to provide comments.

52.    The inclusion of $466,940 in operating costs in the District 1 calculation is contrary to the Generally Accepted Accounting Principles ("GAAP"), which provide that capital expenditures are depreciated over the useful life of an asset.

53.     Moreover, capital expenditures allocated to land are not a reimbursable expense. The Coast Guard's addition of $466,940 to recognized "Administrative Expenses" does not differentiate between land and building and does not explain how it derived the value of $466,940.

54.     The Coast Guard did not adequately justify this element of expense inclusion and increase in the Final Rule.  In allowing real property acquisition costs as reasonable operating expenses, the Coast Guard appeared to rely solely on the comment and an unspecified undisclosed "contemporaneous communication" between the Coast Guard and the St. Lawrence Seaway Pilots Association in violation of the APA.

55.     The allowance of this property acquisition cost as a reasonable operating expense resulted in an unsupportable increase in 2019 hourly pilotage rates in District 1.

**FIRST CLAIM**
**Use of a 270-Working Day Assumption to Calculate a Target Benchmark
Compensation Figure and Reliance on Data Not in the Record in Violation
of the Administrative Procedure Act--Arbitrary and Capricious Agency
Action, Agency Abuse of Discretion, and Agency Action not in Accordance
with Law**

56.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-31 as if fully set forth herein.

57.     In using a 270-working day assumption to calculate a target benchmark compensation figure and relying on data not in the record and not available to the public, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

      a.     failing meaningfully to address rulemaking comments;

      b.     failing to provide rational basis for its decision;

     c.        providing a pre-textual explanation for using a 270-working day

               multiplier;

     d.        departing from prior determinations, including but not limited to the

               determination that pilots are required to observe 10 day per month rest

               periods;

     e.        relying on data not in the record or available to commenters and the

               public; and

     f.        failing to set rates by "giving consideration to the public interest and the

               costs of providing the services," as required by statute. 46 U.S.C. §

               9303(f).

## <u>SECOND CLAIM</u>
**Application of AMO "Guaranteed Overtime" Assertions to Pilotage
Compensation in Violation of the Administrative Procedure Act--Arbitrary
and Capricious Agency Action, Agency Abuse of Discretion, and Agency
Action not in Accordance with Law**

58.      Plaintiffs incorporate each and every allegation contained in Paragraphs 1-26

and 32-34 as if fully set forth herein.

59.      In accepting "guaranteed overtime" representations by AMO and pilots from

AMO sources to increase the target compensation figure, the Coast Guard acted arbitrarily and

capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. §

706(2)(A), in the following ways, among others:

     a.        failing to provide rational basis for its decision;

     b.        providing a pre-textual explanation for using "guaranteed overtime"

               data; and

      c.      failing to set rates by "giving consideration to the public interest and the costs of providing the services," as requested by statute 46 U.S.C. § 9303(f).

## THIRD CLAIM

### Application of Disparate Data Periods in Violation of the Administrative Procedure Act--Arbitrary and Capricious Agency Action, Agency Abuse of Discretion, and Agency Action not in Accordance with Law

60.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-26 and 35-37 as if fully set forth herein.

61.     In using ten years of traffic data to project 2019 traffic volumes, but using shorter periods to determine expenses and manning levels, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

      a.      failing to meaningfully address rulemaking comments;

      b.      failing to provide rational basis for its decision;

      c.      providing a pre-textual explanation for the use of varying time periods for traffic volumes, projected expenses, and manning levels; and

      d.      failing to set rates by "giving consideration to the public interest and the costs of providing the services," as required by statute 46 U.S.C. § 9303(f).

**FOURTH CLAIM**
**Failure to Address Effects on Rate Payers of Overpayment of Pilotage Fees**
**Attributable to Methodological Errors in Prior Years in Violation of the**
**Administrative Procedure Act--Arbitrary and Capricious Agency Action,**
**Agency Abuse of Discretion, and Agency Action not in Accordance with**
**Law**

62.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-26

and 38-46 as if fully set forth herein.

63.     In dismissing the effects on rate payers of overpayment of pilotage fees

attributable to the Coast Guard's methodological errors in calendar years 2016, 2017, and

2018, and in failing to provide for credit or refund of over collected amounts; the Coast Guard

acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the

meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

        a.     failing to meaningfully address rulemaking comments;

        b.     failing to provide any rational basis for its decision; and

        c.     failing to set rates by "giving consideration to the public interest and the

             costs of providing the services." 46 U.S.C. § 9303(f).

**FIFTH CLAIM**
**Failure to Eliminate "Working Capital" as a Basis for Additional Revenue**
**Requirements or to Bound Revenues so Raised to Particular Uses in**
**Violation of the Administrative Procedure Act--Arbitrary and Capricious**
**Agency Action, Agency Abuse of Discretion, and Agency Action not in**
**Accordance with Law**

64.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-26

and 47-48 as if fully set forth herein.

65.     In failing to eliminate the "working capital" component of its rate methodology

as a basis for additional revenue requirements and further failing to limit or otherwise bound

the revenues raised as a result of the "working capital" element of the methodology to

particular uses, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

      a.     failing meaningfully to address rulemaking comments;

      b.     failing to provide rational basis for its decision; and

      c.     failing to set rates by "giving consideration to the public interest and the costs of providing the services," as required by statute. 46 U.S.C. § 9303(f).

**SIXTH CLAIM**
**Addition of $466,940 in Property Acquisition Costs to the Allowable**
**Operating Expense of District One in Violation of the Administrative**
**Procedure Act—Arbitrary and Capricious Agency Action, Agency Abuse**
**of Discretion, and Agency Action not in Accordance with Law**

66.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-26 and 50-55 as if fully set forth herein.

67.     In adding $466,940 in property acquisition costs to the Allowable Operating Expense of District One, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A) in the following ways, among others:

      a.     failing to provide rational basis for its decision;

      b.     relying on inadequate information and information unavailable to commenting parties; and

      c.     failing to set rates by "giving consideration to the public interest and the costs of providing these services," as required by statute 46 U.S.C. § 9303(f).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Declare, hold unlawful, and set aside the Final Rule as arbitrary, capricious, an abuse of discretion, in excess of statutory authority or limitation or short of statutory right, and contrary to procedures required by law;

B.      Vacate and remand the subject rulemaking proceeding to the Coast Guard with instructions to direct recalculation of rates for 2019, and to require future rates to be calculated so as to avoid over collection of pilotage fees from ratepayers;

C.      Require the imposition of a remedy to compensate ratepayers for overpayment of fees that reflect unlawful rate determinations;

D.      Award Plaintiffs their costs and reasonable attorneys' fees incurred herein under the Equal Access to Justice Act and other applicable provisions of law; and

E.      Award Plaintiffs such further and other relief as this Court deems proper.

Dated: June 13, 2019                    Respectfully submitted,

THOMPSON COBURN LLP

By /s/ C. Jonathan Benner
    C. Jonathan Benner (#181610)
    1909 K Street, N.W.
    Suite 600
    Washington, D.C.  20006-1167
    202-585-6900
    FAX 202-585-6969
    jbenner@thompsoncoburn.com

*Attorney for Plaintiffs*